97  361
98  516

ALFRED WOLCOTT, PROSECUTING ATTORNEY OF KENT
COUNTY, v. JOHN W. HOLCOMB, JUSTICE
OF THE PEACE.

*Elections—Right to vote—Inmates of Soldiers' Home—Authority
of inspectors of election.*

1.  The Michigan Soldiers' Home is an *asylum*, within the meaning
    of section 5, art. 7, of the Constitution, which provides that
    "no elector shall be deemed to have gained or lost a residence
    \*   \*   \*   while kept at any alms-house or other asylum at
    public expense."

2.  Where a soldier, at the time of his admission as an inmate of
    the Michigan Soldiers' Home, has a legal residence in a town-
    ship other than that in which the home is situated, he does
    not lose such residence while he remains such inmate, and is
    not a legal voter in the latter township.

3.  Where, by the law under which an election is held, the
    inspectors are to receive the voter's ballot if he takes the oath
    that he possesses the constitutional qualifications, the oath is
    the conclusive evidence on which the inspectors are to act, and
    they are not at liberty to refuse to administer it, or to refuse
    the vote after the oath has been taken; citing Cooley, Const.
    Lim. 617.

*Mandamus.*    Argued June 13, 1893.    Granted November
10, 1893.

Relator applied for *mandamus* to compel respondent to
entertain a complaint and issue a warrant for an alleged
violation of the election law.    The facts are stated in the
majority opinion.

*Alfred. Wolcott, in pro. per. (Moses Taggart, of counsel),* for relator.

*Henry J. Felker,* for respondent.

GRANT, J.   The principal question presented in this case is whether the inmates of the Soldiers' Home, situated in the township of Grand Rapids, in Kent county, are entitled to vote in that township. Section 5, art. 7, of the Constitution, reads as follows:

"No elector shall be deemed to have gained or lost a residence by reason of his being employed in the service of the United States, or of this State;   *   *   *   nor while a student of any seminary of learning; nor while kept at any alms-house or other asylum at public expense; nor while confined in any public prison."

The Soldiers' Home was erected under Act No. 152, Laws of 1885 (3 How. Stat. § 1984a *et seq.*), entitled "An act to authorize the establishment of a home for disabled soldiers, sailors, and marines in the State of Michigan." By the act, $100,000 was appropriated from the general fund in the State treasury for its erection and equipment, and $50,000 for the purpose of maintaining it for the years 1885 and 1886.   It has since been supported by annual appropriations made by the Legislature.   Section 11 of the act, as amended by Act No. 44, Laws of 1891, provides the conditions for admission to the home, which are as follows: All applicants must be honorably discharged soldiers, sailors, or marines, who served in the army or navy of the United States in the war of the rebellion or in the Mexican war; they must be disabled by disease, wounds, or otherwise; must have no adequate means of support; must be incapable of earning their living, and otherwise dependent upon public or private charity.   The board of managers is, by the same section, empowered to adopt rules and regulations to govern the admission of applicants.   Among the rules adopted by the board for such admissions is one

requiring the applicant to show by satisfactory evidence "that he has no relatives of sufficient ability to maintain him, who are legally liable for his support under the laws of the State of Michigan." Another rule provides that he must produce "the certificate of the supervisor of the township or ward in which the applicant resides, the county clerk or judge of probate of the county in which the applicant resides, or any member of the board of managers, that he has carefully examined the proofs; that, to the best of his knowledge and belief, they are true and satisfactory to him; and that the applicant is a proper person for admission." The act further provides that no applicant shall be admitted who has not been a resident of the State for one year next preceding the date of the passage of the act, unless he served in a Michigan regiment or was accredited to the State of Michigan.

Uriah Carpenter, the inmate of the home whose right to vote is here in question, was at the time of his application and admission, in 1887, a resident of the township of Woodstock, in Lenawee county. In his application he made affidavit that he was a resident of that township, and upon it is indorsed the certificate of the supervisor that he was then an "*actual resident*" thereof. His vote was challenged and rejected on the ground that he was not an elector in the township of Grand Rapids.

The Soldiers' Home is purely eleemosynary in character. To hold otherwise would be contrary to sound legal principle and good sense. The title to the act shows it. It is not the character of the beneficiaries, nor the cause of their inability to earn a living, nor the reason for granting the bounty, which determines whether such an institution is charitable in its character. An institution established and maintained for the support of indigent persons who became blind or deaf in the service of their

country or State is as much eleemosynary as one established for the support of those who were born blind or deaf, or who have become so from other causes. All institutions in this State, established, and maintained at the public expense, for the care, education, and support of the unfortunate, belong to this class of institutions, and are included in the term "asylum," used in the above clause of the Constitution. It is immaterial whether they are called schools, retreats, homes, or asylums. It is equally immaterial what the feeling is which prompts their erection and maintenance. An "asylum" is defined by Webster to be "an institution for the protection or relief of the unfortunate." Such is its meaning as used in the Constitution. It follows that one's entry and residence in such an institution partake of the same character as the institution itself, and are likewise eleemosynary in character. One entering them cannot, under the Constitution, gain or lose his residence. Inmates of the home enter it for one purpose only, and the Constitution solemnly and clearly declares that their *status* as to residence when they enter must control while they remain there. When Mr. Carpenter entered the home, he was a legal resident of the township of Woodstock. He entered the home upon his own application, solely as a beneficiary, and a resident of that township, to accept a well-bestowed and deserving charity. He did not by this act lose his residence there, and his intent is wholly immaterial. To permit his intent to control would result in the practical annulment of this provision of the Constitution. The mischief intended to be avoided is as apparent in this case as in any. The inmates of the home own no property, pay no local taxes, do no work in or for the benefit of the municipality, and have no pecuniary interest in its local affairs. In fact, they have no connection with, and stand in no relation to, the local

municipal government. They occupy State property, and are exclusively under the control and management of the State.

This provision of our Constitution was evidently copied from that of New York, for the two are nearly identical in language. The court of appeals of that state, in an opinion concurred in by the entire court, held that the inmates of the soldiers' home of that state were not entitled to vote in the municipality where the home was located. *Silvey v. Lindsay*, 107 N. Y. 55. The facts in that case and in this are substantially identical. After stating the facts, the court say:

"These reasons satisfied the conscience of the plaintiff [the inmate], and enabled him to say he was a resident of Bath, but in reality they bring the case within the prohibition of the constitution. He could not gain a residence by being an inmate, which means nothing more than his presence in the home; and, excluding that, there is nothing in the case to show that a residence in Bath had been acquired. It follows that he has not lost the right to vote in the place of his legal residence,—New York. * * * As to that city, he is to be regarded as temporarily absent, and his residence as a citizen still therein.

"We have no doubt that the institution in question is within the purview of the constitutional provision. * * * It is an asylum supported at the public expense, and its members are within the mischief against which that provision is aimed,—the participation of an unconcerned body of men in the control, through the ballot-box, of municipal affairs, in whose further conduct they have no interest, and from the mismanagement of which by the officers their ballots might elect they sustain no injury."

This language is applicable to the present case, and we quote it with approval.

But it is insisted that that case still leaves the question open to depend upon the intention of the elector, by reason of the following language:

"But the question in each case is still, as it was before the adoption of the constitution, one of domicile or resi-

dence, to be decided upon all the circumstances of the case. The provision (art. 2, § 3) disqualifies no one; confers no right upon any one. It simply eliminates from those circumstances the fact of presence in the institution named or included within its terms. It settles the law as to the effect of such presence, and as to which there had before been a difference of opinion, and declares that it does not constitute a test of a right to vote, and is not to be so regarded. The person offering to vote must find the requisite qualifications elsewhere."

Mr. Carpenter, as above stated, was a resident and elector in the township of Woodstock, which was then his domicile of citizenship, when he made his application and was admitted to the home. There was no indication in his application of any intention to change his residence for the purpose of voting, or for any other purpose than that for which the home was established. In his complaint against the election inspectors he states that he had always lived with his father prior to his death, in 1887; that he was unmarried; that by the death of his father the home was broken up; that since that time he had had no home with any relative or friend; and "that he always intended, and in fact made, the township of Grand Rapids, and that part of it in which said Soldiers' Home is located, his home, *subsequent to his entry therein.*" His father was living at the time he entered the home. If he entered as a resident of Woodstock, and that was then his actual residence, can he gain a new residence while kept in this asylum at public expense, except in violation of this plain provision of the above section? Would not this be losing one residence and gaining another while kept in an asylum at public expense? In the New York case the inmate had been in the home for six years, and swore that it was his intention at all times to make his residence in said institution so long as he should be permitted to do so. Is Mr. Carpenter's statement in fact any stronger than this? Does he swear to any residence or domicile of citizenship aside from

that which attached to him as an inmate of the home? That case gives us no light upon the requisite qualifications which must be found elsewhere. It determined the one question before the court, and held that one who had been for six years an inmate, and who swore that he intended to remain there the rest of his life if permitted to do so, was not an elector in the township where the home was located. If the inmate was a resident of the township where the home is located at the time of his admission, the requisite qualifications of an elector would be found in that fact, and his right to vote would be undoubted.

We are of the opinion that the terms "by reason of" and "while" were understood by the framers of the Constitution to have a different meaning. In the former case the intention would very largely, if not entirely, govern the question of domicile, while in the latter it would not. It was clearly the intention of the former provision to give the citizen the right, if he chose, to carry his residence with him to the place where he was employed in the service of the United States or of the State, and in the latter case it seems equally clear that it was the intention not to give that right. What object otherwise could there have been in the use of these two terms?

While the results of the adoption of one construction of the fundamental law of the State are not conclusive nor of much force where the construction is otherwise clear, still they are important considerations in determining the intent and purpose of the law. If the construction contended for by the relator be correct, it follows that all the inmates of county alms-houses and of prisons and jails are electors, at their option, in the townships and cities where those institutions are located. In the township of Nankin, in Wayne county, where the alms-house of that county is located, there were, in the year 1891, 1,851 male inmates, more than twice the whole number of voters in the town-

ship. Annual Report of Superintendents of Poor, 1891, p. 11. Furthermore, students in all institutions of learning, although they are in attendance there for the sole purpose of obtaining an education, might, at their own will, become electors in the places where such institutions are located. We think the Constitution prohibits a change of residence under such circumstances, and that, when one's presence in any of the institutions named is due to the sole purpose of receiving the benefits conferred, his former residence must be considered his domicile for citizenship.

We are cited to the language of Mr. Justice CAMPBELL in *Warren v. Board of Registration*, 72 Mich. 401. That language is conceded to be a *dictum*. It is not, therefore, binding in this case. It has often been said by this and other courts that the language of a decision must be construed with reference to and confined to the facts of that case. The sole question in that case was whether the lodging room or boarding place of the voter should govern. Applied to that question, the language was appropriate, and the reasoning conclusive.

No question of disfranchisement is involved. The inmates of the home are no more disfranchised than were the soldiers when absent from their domiciles and in the army. The people in that case amended their Constitution, providing that they might cast their votes when absent from home in the service of their country. So, in this case the people may amend their Constitution, either making these inmates electors in the township where the home is located, or providing for casting their ballots at the home, to be counted in the township from which they came.

Another question of no little importance is also involved. Are inspectors of election clothed by the law with judicial or only ministerial functions? Have they the right to reject a ballot when the voter is registered, and tenders the oath prescribed by the statute? Mr. Carpenter was

registered, took the prescribed oath, and tendered his ballot, which the inspectors refused to receive. Section 24, Act No. 190, Laws of 1891, determines the conditions under which a challenged voter may have his vote received. This section is the same as those in former laws, and was referred to in *People v. Cicott*, 16 Mich. 302, where it was said that "the inspectors cannot reject a registered voter who takes the proper oath." The statute is clearly mandatory. It says that, "if the person so challenged shall take such oath, his vote shall be received." Inspectors are sometimes partisan and sometimes corrupt, and the clear purpose of the act is to take from them all discretionary and judicial power, and confer upon them a purely ministerial function. The qualification of the voter is no concern of theirs. Upon taking the oath, his vote must be received. If he swear falsely, the law provides a way to deal with him. Mr. Cooley states the rule as follows:

"Where, however, by the law under which the election is held, the inspectors are to receive the voter's ballot if he takes the oath that he possesses the constitutional qualifications, the oath is the conclusive evidence on which the inspectors are to act, and they are not at liberty to refuse to administer the oath, or to refuse the vote after the oath has been taken. They are only ministerial officers in such a case, and have no discretion but to obey the law and receive the vote." Cooley, Const. Lim. 617.

For this reason it was the duty of the respondent to entertain the complaint, issue a warrant, and proceed to an examination.

The writ must issue.

McGRATH and MONTGOMERY, JJ., concurred with GRANT, J.

HOOKER, C. J. I cannot concur in the proposition that article 7, § 5, of the Constitution of this State should be so construed as to deprive a citizen of his right to choose his

own residence, or to compel him to avail himself of the privileges of asylums or schools at the cost of a citizen's privileges, by requiring him to retain a former residence, inaccessible, and to which he does not intend to return. It should not be assumed that those who inhabit alms-houses or asylums are unworthy people, or that they have no interest in elections, or that they are disqualified from discharging the duties of the citizen understandingly and properly. It cannot be claimed that these men are dis-franchised, because, under the section, no one is denied the right to vote at his residence. Inmates formerly resid-ing in the township where the asylum is situated do not lose their residences by reason of being such inmates, and, clearly, others retain their residences, and the right to vote, at their former domiciles, if they choose to do so. The only reasons given for the construction contended for are that these classes are undesirable voters at the place of the asylum; that they pay no taxes, do no work for the bene-fit of the municipality, and have no interest in local affairs. The same may be said of many persons in all localities, and was probably as true of these before their admission as after. It is as true of those admitted from the locality of the asylum, who may vote under this sec-tion, as of those who come from a distance, who may not vote under this construction. It never has been a requisite to electoral rights that the citizen should pay taxes, do work for the benefit of the municipality, or evince interest in municipal affairs; nor does the right depend upon a wise or even honest exercise of the privilege of the ballot. Doubtless there are many whose votes could be dispensed with to the profit of their respective municipalities and the State as well, but the electoral franchise is based upon broader principles. There is no man so poor or low that he is not richer and manlier for his political equality, and

the ballot is essential to the protection of the rights of all classes. Immediately a class or race is disfranchised, its members are deprived of an equal chance with their fellows. This proposition is so important a part of the foundation of our institutions that it should not be eliminated or weakened by any unnecessary construction of a constitution based upon civil liberty and political equality. Under this construction, a student who goes to our State University for a term of years, abandoning his residence, taking his family with him, residing in a house of his own, with no intention of living elsewhere after his education shall be finished, cannot gain a residence there, or lose his former one. It cannot be said that he is an undesirable voter, that he has no interest in local concerns, or that he is not a tax-payer there. The true construction of this section should be just what its language imports, *i. e.*, that being kept in an alms-house, or attendance at college, or employment in the service of the United States, or the navigation of the lakes or high seas, does not work a change of residence against the intention or desire of the individual. I have an acquaintance, the intelligent master of a great lake steamer, who is at home only occasionally, who comes home the day before election to vote,—a right which this section secures to him, though absent most of the year. Will it be said, that he cannot change his residence so long as his employment continues? It would seem that these things cannot have been intended, and that the rule indicated is the reasonable one, viz., that the section was designed for the benefit of and to enlarge and protect the rights of these classes, not to deprive them of privileges common to all.

The opinion of the late Mr. Justice CAMPBELL is in accord with this view, as appears from a *dictum* in the case of *Warren v. Board of Registration*, 72 Mich. 401, where he cites this section, after stating that—

"Our own Constitution is full on this subject, where it lays down expressly, what would perhaps be implied, that certain continuous presences or absences shall have no effect on elective residence." And he adds: "*These provisions do not prevent such persons from becoming residents, if such is their purpose, and if they are able to choose.*"

The case of *Silvey v. Lindsay*, 107 N. Y. 55, which is relied upon as authority by counsel for respondent, is reconcilable with this view, and does not appear to go to the extent of holding the doctrine contended for. In that case a vote was rejected because the voter did not show himself to be a resident of the township. His vote being challenged, he answered as follows:

"I answer that I reside in the town of Bath, *for the reason* that I was admitted an inmate of the New York soldiers' and sailors' home in this town, by the authorities thereof, in the year 1880, and have remained such inmate from that time to the present, with the intention at all times of making my residence in said institution so long as I shall be permitted to remain such inmate. At the time of my admission to said institution I was an honorably discharged soldier of the United States, and a resident and voter·of the city of New York. I therefore answer that I am a resident of the town of Bath. In becoming an inmate of said institution, I intended to change my residence from the city of New York to the fifth election district of said town of Bath."

It will be observed that after stating the facts of his former residence and his admission to the soldiers' home, and his intention of making his residence in said institution as long as he should be permitted, he argues: "I therefore answer that I am a resident·of the township of Bath."· The opinion says:

"It is obvious that his narration of an intention to change his residence to Bath, and his assertion that he resided in Bath, can be accepted only as conclusions from the circumstances detailed in connection with them. They were his conclusions, and defendants, in view of his whole statement, were not bound by·them. They were bound by

the facts stated, and were required to say upon those facts whether the plaintiff was qualified in the necessary particular, and undoubtedly they were to determine the question at their peril. The constitution, in the section referred to (*supra*), specifies the qualifications necessary to the elective franchise, provides who shall have the right to vote, and one duly qualified cannot be deprived of that right by any inferior tribunal. But the constitution also provides (art. 2, § 3): 'For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States; nor while engaged in the navigation of the waters of this state, or of the United States, or of the high seas; nor while a student of any seminary of learning; nor while kept at any alms-house or other asylum at public expense; nor while confined in any public prison;' and the decision of the inspectors of election was that, in their opinion, the intending voter was in Bath as a mere inmate of the institution, and for a temporary purpose, and not as a resident of the voting district, or with intent to make the town a fixed or permanent place of residence, and so it would seem. His presence there was eleemosynary in its character. He was there as a dependent, because he had no means of support or relatives to maintain him, and liable to be discharged whenever the board of trustees were satisfied that he was of sufficient ability or means to support himself. (Rules and regulations of the home.) As to the home, he was a beneficiary, and nothing else. As to Bath, his residence was a beneficiary's residence, and no other. His relations were not with the village, but with the institution which was situated within its borders. His intention to remain was conditioned upon and limited to the duration of the charity which he enjoyed. His intention to remain in Bath depended upon his expectation to remain at the home. This gave no residence, for he was there only in the character of a beneficiary, for a temporary purpose. His only intention in going to Bath was to be an inmate of the home, and it was only as such inmate that his residency was to be continued. He was not there as a citizen changing his residence, but as an object of well-bestowed and deserving charity. He was, as is clear upon his statement, present in Bath, and at the institution, because he was then 'kept' (that is, supported) * * * 'at public expense.' 'I reside in Bath,' he says, 'for the reason that I was admitted to the home as an inmate.' He

continues there with the intention of making his residence in the institution so long, he says, 'as I shall be permitted to remain an inmate.' These reasons satisfied the conscience of the plaintiff, and enabled him to say he was a resident of Bath, but in reality they bring the case within the prohibition of the constitution. He could not gain a residence by being an inmate, which means nothing more than his presence in the home; and, excluding that, there is nothing in the case to show that a residence in Bath had been acquired. It follows that he has not lost the right to vote in the place of his legal residence,—New York,—for the provision of the constitution in question also declares that he shall not lose his residence by reason of such 'presence' in the 'institution.' As to that city, he is to be regarded as temporarily absent, and his residence as a citizen still therein.

"We have no doubt that the institution in question is within the purview of the constitutional provision (art. 2, § 3) above referred to. It is an asylum supported at the public expense, and its members are within the mischief against which that provision is aimed,—the participation of an unconcerned body of men in the control, through the ballot-box, of municipal affairs, in whose further conduct they have no interest, and from the mismanagement of which by the officers their ballots might elect they sustain no injury."

If this language should create the impression that the section of the constitution does more than to negative an implication of a change of domicile from the fact of residence in the institution, the next paragraph of the opinion settles the question, clearly showing that the court did not intend to hold that inmates of a soldiers' home could not acquire a residence in the locality of the home, and, to my mind, clearly implying that, had the voter stated that he entered said home with the intention of abandoning his former domicile, and making a new one in the locality of the home, the decision would have been different; and hence, instead of supporting respondent's contention, the case contains a plain *dictum* to the contrary. It is as follows:

"But the question in each case is still, as it was before the adoption of the constitution, one of domicile or residence, to be decided upon all the circumstances of the case. The provision (art. 2, § 3) disqualifies no one; confers no right upon any one. It simply eliminates from those circumstances the fact of presence in the institution named or included within its terms. It settles the law as to the effect of such presence, and as to which there had before been a difference of opinion, and declares that it does not constitute a test of a right to vote, and is not to be so regarded. The person offering to vote must find the requisite qualifications elsewhere.

"We think, therefore, the question submitted by the parties, viz., 'Did James Silvey gain a residence in the town of Bath so as to entitle him to vote at said town meeting by reason of his presence as an inmate of said institution?' should have been answered in the negative, and it is so answered by this court."

In my opinion, the writ should issue as prayed.

LONG, J., concurred with HOOKER, C. J.