## WILKINS *v.* ANN ARBOR CITY CLERK

### OPINION OF THE COURT

1. ELECTIONS—CONSTITUTIONAL LAW—RESIDENCE—WEALTH—PROPERTY OWNERSHIP—TRAVEL.

    Questions asked of persons concerning wealth, property ownership, and travel, if used as criteria to establish residence for voting purposes are constitutionally impermissible.

2. ELECTIONS — RESIDENCE — STUDENTS — STATUTES — CONSTITUTIONAL LAW — DUE PROCESS.

    Statute providing, in part, that no elector shall be deemed to have gained or lost a residence while a student at any institution of learning, insofar as it applies to students, violates the Due Process Clauses of the United States and Michigan Constitutions; as it applies to students, it is overly broad and grants a constitutionally prohibited discretion to local clerks in Michigan (US Const, Am 14; Const 1963, art 1, § 17; MCLA § 168.11[b]).

3. CONSTITUTIONAL LAW—RIGHT TO VOTE—ELECTIONS.

    The right to vote is one of the most precious, if not the most precious, of all our constitutional rights.

4. CONSTITUTIONAL LAW—RIGHT TO VOTE—ELECTIONS.

    Plaintiffs who were refused registration for the purpose of voting need not demonstrate an absolute denial of the right to vote in order to require the state to show a compelling interest but need only show that a burden has been placed upon this precious right in order to avail themselves of the Equal Protection Clause (US Const, Am 14).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 26 Am Jur 2d, Elections § 106.
[2, 6–9, 11–13, 15–18] 26 Am Jur 2d, Elections § 71.
[3–5] 26 Am Jur 2d, Elections §§ 7, 225.
[10] 50 Am Jur, Statutes § 74.
[14] 16 Am Jur 2d, Constitutional Law §§ 144–151, 154.

5. CONSTITUTIONAL LAW—RIGHT TO VOTE—ELECTIONS—EQUAL PROTECTION.

> The Equal Protection Clause guards against subtle restraints on the right to vote, as well as outright denial (US Const, Am 14).

6. ELECTIONS—PRESUMPTIONS—RIGHT TO VOTE—STUDENTS.

> The fact that a burden is placed on the right to vote because a student must overcome a rebuttable presumption that he is not a resident in the locale of the institute of learning contained in a statute providing, in part, that no elector shall be deemed to have gained or lost a residence while a student at any institution of learning, as applied to students, is sufficient to require the state to demonstrate a compelling interest (MCLA § 168.11[d]).

7. ELECTIONS—RESIDENCE—STUDENTS—VOTING FRAUD.

> Statute providing, in part, that no elector shall be deemed to have gained or lost a residence while a student at any institution of learning, insofar as it applies to students, is not necessary to insure the prevention of voting fraud, in view of the complete set of statutory safeguards to insure the purity of the election process (MCLA §§ 168.11[b], 168.493, 168.495, 168.499, 168.505, 168.508, 168.510, 168.513, 168.515, 168.523).

8. JURY—QUALIFICATIONS—REGISTERED VOTERS—STUDENTS.

> Denying students the right to register and vote also denies them the time honored Anglo-Saxon tradition of trial by a jury of their peers as jury lists are chosen from lists of registered voters (MCLA § 600.1310 *et seq.*).

9. ELECTIONS—STUDENTS—RIGHT TO VOTE—RESIDENCE—STATE INTEREST.

> Students cannot be denied the right to vote, under the statute, providing, in part, that no elector shall be deemed to have gained or lost a residence while a student at any institution of learning, because of the state's interest promoting an informed and concerned electorate; there is every reason to believe they might be even better informed on current issues than other citizens (MCLA § 168.11[b]).

10. STATUTES—COURTS.

> Courts may take cognizance of facts and events surrounding the passage and purpose of legislation.

11. ELECTIONS—RIGHT TO VOTE—STUDENTS—CONSTITUTIONAL LAW.

> It is no longer constitutionally permissible to exclude students from the franchise because of the fear of the way they may

vote; the right to vote means the right to vote for the candidate of one's choice regardless of ideology.

12. ELECTIONS — RESIDENCE — STUDENTS — STATUTES — CONSTITUTIONAL LAW — EQUAL PROTECTION — TAXATION.

Statute providing, in part, that no elector shall be deemed to have gained or lost a residence while a student at any institution of learning, as it applies to students, is unconstitutional as a violation of the Equal Protection Clauses of the United States and Michigan Constitutions as to students who are taxed without being represented (US Const, Am 14; Const 1963, art 1, § 2; MCLA § 168.11[b]).

13. ELECTIONS—STUDENTS—REGISTRATION.

Students must be treated the same as all other registrants for voting and no special questions, forms, identification, etc., may be required of them.

CONCURRING OPINION

T. E. BRENNAN and WILLIAMS, JJ.

14. STATUTES—CONSTRUCTION—CONSTITUTIONAL LAW.

*The constitutionally valid construction of a statute is to be preferred if it can be construed so as to avoid constitutional invalidity.*

15. ELECTIONS—RESIDENCE—STUDENTS—STATUTES.

*Statute providing, in part, that no elector shall be deemed to have gained or lost a residence while a student at any institute of learning simply means that a student is not to be deemed to have lost his residence automatically by reason of being a student; the proviso gives the student an option and his intention in the matter is controlling (MCLA § 168.11[b]).*

OPINION CONCURRING WITH T. E. BRENNAN, J.

WILLIAMS, J.

See Headnotes 14 and 15.

CONCURRING OPINION

ADAMS, J.

16. ELECTIONS—STUDENTS—RIGHT TO VOTE.

*There is no rational basis for treating students differently from other citizens in their exercise of the fundamental right to vote.*

17. ELECTIONS—RESIDENCE—VOTING—STUDENTS.

*For voting purposes, there is no rational basis for distinguishing between students who reside at a given locality for nine months of the year and non-students who reside in the same locality for nine months of the year.*

18. ELECTIONS — CONSTITUTIONAL LAW — EQUAL PROTECTION — DISCRIMINATION — STUDENTS — QUALIFICATIONS TO VOTE.

*Requiring additional qualifications to vote which affect different groups unequally, whether by income, occupation, or employment, is a denial of equal protection and special treatment of students is an arbitrary and invidious discrimination against them in violation of both the Michigan and United States Constitutions (US Const, Am 14; Const 1963, art 1, § 2).*

Appeal from Court of Appeals, Division 2, McGregor, P. J., and Danhof and Larnard, JJ., affirming Washtenaw, James R. Breakey, Jr., J.   Submitted June 24, 1971.   (No. 29 June Term 1971, Docket No. 52,953.)   Decided August 27, 1971.

24 Mich App 422 reversed.

Complaint for mandamus by Sally Wilkins and others against John P. Bentley, Ann Arbor City Clerk, to compel registration of plaintiffs to vote in the city of Ann Arbor.   Writ granted as to some plaintiffs and denied as to others.   Plaintiffs appealed to the Court of Appeals.   Affirmed.   Plaintiffs appeal.   Reversed and remanded for further proceedings.   *

*Douvan, Harrington & Carpenter,* for plaintiffs.

*Jerold Lax,* City Attorney, and *Edward B. Goldman,* Assistant City Attorney, for defendant.

SWAINSON, J.   Eight University of Michigan students were, upon timely application therefor, refused registration for the purpose of voting, by

the defendant clerk. By this petition for writ of mandamus, they seek the right to register and vote in Ann Arbor. One plaintiff, Carol B. Shalita, was dropped prior to trial. The cause was tried on June 11 and 12, 1968, on the amended pleadings and the pretrial statement.

The opinion of the trial court was rendered on August 23, 1968, and judgment was entered on September 10, 1968. By consent of the defendant, plaintiffs Schultz and Jones were permitted to register and vote in Ann Arbor. By judgment of the court, plaintiffs Eichenbaum and Hollenshead were awarded the right to register and vote in Ann Arbor. Plaintiffs Wilkins, Jendryka and D'Haem were denied the right to register and vote in Ann Arbor.

The parties stipulated that the plaintiffs Wilkins, Jendryka and D'Haem are citizens of the United States and that at the time they had applied for voter registration were over the age of 21 years and had resided in the State of Michigan for more than six months. Each of them maintained an apartment in Ann Arbor and had habitually slept there. Each of them commonly kept his personal effects in his apartment and his regular place of lodging was in Ann Arbor. It is agreed that the trial court denied the plaintiffs-appellants the right to register and vote in Ann Arbor under the provisions of MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]). The Court of Appeals affirmed on the grounds that said subsection (b) aids in preserving the purity of elections and guards against abuses of the elective franchise by minimizing the possibility of a person voting twice in the same election. 24 Mich App 422, 427. We granted leave to appeal. 384 Mich 782.

MCLA § 168.11 (Stat Ann 1971 Cum Supp § 6.1011) provides as follows:

"(a) The term 'residence', as used in this act, for registration and voting purposes shall be construed to mean that place at which a person habitually sleeps, keeps his or her personal effects and has a regular place of lodging. Should a person have more than 1 residence, or should a wife have a residence separate from that of the husband, that place at which such person resides the greater part of the time shall be his or her official residence for the purposes of this act. *This section shall not be construed to affect existing judicial interpretation of the term residence.* (Emphasis added.)

"(b) *No elector shall be deemed to have gained or lost a residence* by reason of his being employed in the service of the United States or of this state, nor while engaged in the navigation of the waters of this state or of the United States or of the high seas, nor *while a student at any institution of learning,* nor while kept at any almshouse or other asylum at public expense, nor while confined in any public prison. Honorably discharged members of the armed forces of the United States or of this state and who reside in the veterans' facility established by this state may acquire a residence where the facility is located. (Emphasis added.)

"(c) No member of the armed forces of the United States shall be deemed a resident of this state in consequence of being stationed in any military or naval place within the state."

The part of subsection (b), dealing with students, has been defined by our Court to mean that a student must overcome a rebuttable presumption that he is not a resident in the locale of the institution of learning. *Wolcott* v. *Holcomb* (1893), 97 Mich 361; *People* v. *Osborn* (1912), 170 Mich 143; *Attorney General, ex rel. Miller,* v. *Miller* (1934), 266 Mich 127. Plaintiffs contend that this statute

violates the due process and equal protection clauses of the Michigan Constitution[1] and the United States Constitution.[2]  We turn first to plaintiffs' contentions under the due process clause.

## I.

We deal here with the right to vote, labeled by the United States Supreme Court almost a century ago "as a fundamental political right, because preservative of all rights."  *Yick Wo* v. *Hopkins* (1886), 118 US 356, 370 (6 S Ct 1064, 30 L Ed 220).  The Courts have closely scrutinized any law that interferes with fundamental rights to insure that they are not unduly vague or give local officials unfettered discretion.[3]  In cases involving voter registration, the United States Supreme Court has struck down state laws which gave unfettered discretion to local officials.  As Mr. Justice Black stated for a unanimous Court in *Louisiana* v. *United States* (1965), 380 US 145, 153 (85 S Ct 817, 13 L Ed 2d 709):

[1] Const 1963, art 1, § 2, provides: "No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin.  The legislature shall implement this section by appropriate legislation."

Const 1963, art 1, § 17, provides: "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law.  The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed."

[2] US Const, Am 14, § 1, provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[3] See, *e.g.*, *Kunz* v. *New York* (1951), 340 US 290 (71 S Ct 312, 95 L Ed 280).

"The cherished right of people in a country like ours to vote cannot be obliterated by the use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar."[4]

In a recent article concerning student voting, W. P. Bullard and J. Rice, *Restrictions on Student Voting: An Unconstitutional Anachronism,* 4 Journal of Law Reform 215 (1970), the authors point out by analogy, that students face many of the same problems as found by others when faced with voter qualification tests:

"Although the voter qualification tests involved were used to disfranchise blacks, thus bringing into play the fifteenth as well as the fourteenth amendment, the inherent vagueness of the interpretation test and the imprecise criteria used by the registrars presented prospective black voters with a dilemma analogous to that faced today by students. Although students must demonstrate greater attachment to the university locale than must most other registrants, the quantum of required attachment is quite unclear."[5]

The authors point out that while the law defining voting residence for other citizens under MCLA § 168.11(a) (Stat Ann 1971 Cum Supp § 6.1011[a]), is clear and unequivocal, the effect of the law, as applied to students, under subsection (b) varies from city to city and from local clerk to local clerk.

"Therefore, in Michigan, as well as in other states, the standards which students must meet in order to vote in the locality in which their college is located are extremely vague. In Michigan, the guidelines are so vague as to be tantamount to no standards; thus each registration clerk determines himself

---

[4] See, also, *Schnell* v. *Davis* (1949), 336 US 933 (69 S Ct 749, 93 L Ed 1093), *affirming* 81 F Supp 872.
[5] Bullard & Rice, *supra,* at p 221.

which factors will overcome the presumption against student registrability in his city."[6]

The record in this case amply supports this assertion. The Ann Arbor city attorney conceded in oral argument before this Court that while Ann Arbor uses an elaborate questionnaire before allowing students to register,[7] the city clerk of Detroit (where Wayne State University and several colleges are located) does not ask any special questions of student registrants.

At the trial, the plaintiffs were asked questions concerning bank accounts; where they obtained their support; whether they owned or leased property, and where they spent their vacations.[8] However, these questions concerning wealth,[9] property ownership,[10] and travel,[11] if used as criteria to establish residence for voting purposes are constitutionally impermissible.

We hold that MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]), insofar as it applies to students, does violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution. We further hold that said provision of

[6] Bullard & Rice, *supra*, at p 220.

[7] For a comparison of some of the questionnaires used by city clerks for student registration, see Appendix, 4 Journal of Law Reform, pp 239–243.

[8] 4 Journal of Law Reform, pp 239, 240.

[9] In *Harper* v. *Virginia Board of Elections* (1966), 383 US 663 (86 S Ct 1079, 16 L Ed 2d 169), the Court struck down a poll tax as a classification based on wealth. Questions concerning bank accounts, support, etc., are similarly classifications based on wealth.

[10] See, also, *Kramer* v. *Union Free School District* (1969), 395 US 621 (89 S Ct 1886, 23 L Ed 2d 583); *Cipriano* v. *Houma* (1969) 395 US 701 (89 S Ct 1897, 23 L Ed 2d 647). These cases held that states cannot deny the right to vote to nonproperty owners.

[11] In *Shapiro* v. *Thompson* (1969), 394 US 618 (89 S Ct 1322, 22 L Ed 2d 600), the Court struck down residency requirements for welfare recipients on the ground that they interfered with the right to travel, a fundamental constitutional right. Similarly, it is unconstitutional to deny the right to vote to students who exercise their right to travel and leave Ann Arbor for the summer.

MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]) violates art 1, § 17, of the 1963 Michigan Constitution. Subsection (b), as it applies to students, is overly broad and grants a constitutionally prohibited discretion to local clerks in Michigan. The ability to exercise the precious right to vote cannot depend on whether a student attends school in a large city or a smaller town. *Reynolds* v. *Sims* (1964), 377 US 533 (84 S Ct 1362, 12 L Ed 2d 506).

However, if this were the only infirmity of the statute, we could correct this defect by issuing guidelines consistent with the Constitution. We, therefore, turn to plaintiffs' claim that subsection (b) violates the equal protection clauses of the United States and Michigan Constitutions.

## II.

Traditionally, statutes have been upheld as constitutional under the equal protection clause if they met the following test:

" '1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis,

but is essentially arbitrary.'" *Naudzius* v. *Lahr* (1931), 253 Mich 216, 222, 223.

However, a different test has been used in two separate types of cases. First, if the asserted classification was on the basis of race or other disfavored classification, the state has to meet "the very heavy burden of justification  *  *  *  ." *Loving* v. *Virginia* (1967), 388 US 1, 9 (87 S Ct 1817, 18 L Ed 2d 1010), and (p 11):

"At the very least the Equal Protection Clause demands that racial classification, especially suspect in criminal statutes, be subjected to the 'most rigid scrutiny,' *Korematsu* v. *United States,* 323 US 214, 216 [65 S Ct 193, 89 L Ed 194] (1944), and, if they are ever to be upheld, they must be shown to be necessary to the accomplishment of some permissible state objective independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate."

The second group of cases requiring the higher standard involved the assertion of a fundamental constitutional right.

"But in moving from State to State or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling governmental interest,* is unconstitutional." (Emphasis added.) *Shapiro* v. *Thompson* (1969), 394 US 618, 634 (89 S Ct 1322, 22 L Ed 2d 600).

It can be stated without exaggeration that the right to vote is one of the most precious, if not the most precious, of all our constitutional rights. The United States Supreme Court has stated concerning the right to vote:

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." *Wesberry* v. *Sanders* (1964), 376 US 1, 17, 18 (84 S Ct 526, 11 L Ed 2d 481).

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds* v. *Sims, supra,* at p 555.

The United States Supreme Court has applied the compelling interest test in recent cases involving the right to vote. Chief Justice Warren in *Kramer* v. *Union Free School District* (1969), 395 US 621, 627 (89 S Ct 1886, 23 L Ed 2d 583), stated:

"Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are *necessary to a compelling interest.*" (Emphasis added.)

The compelling interest test has been applied with one exception[12] to all of the recent voting cases, including *Oregon* v. *Mitchell* (1970), 400 US 112 (91 S Ct 260, 27 L Ed 2d 272).

Thus, in determining whether MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]), as it applies to students, violates the Equal Protection Clause, we must apply the compelling state interest test.

---

[12] *McDonald v. Board of Election Commissioners of Chicago* (1969), 394 US 802 (89 S Ct 1404, 22 L Ed 2d 739).

If the state is unable to demonstrate a compelling interest, that part of the statute must fall.

## III.

Although there is no case directly on point, the United States Supreme Court has dealt with the denial of the right to vote to various groups of people on several occasions in the past few years.

*Carrington* v. *Rash* (1965), 380 US 89 (85 S Ct 775, 13 L Ed 2d 675), involved a provision of the Texas Constitution which prevented servicemen from voting in state elections as long as they remained in the service. The Court struck down the law as a denial of the Equal Protection Clause.

In *Kramer* v. *Union Free School District, supra,* the Supreme Court invalidated under the Equal Protection Clause a New York law[13] which provided that only people who owned or leased property or parents with children in schools could vote in certain school district elections.

In *Cipriano* v. *Houma* (1969), 395 US 701 (89 S Ct 1897, 23 L Ed 2d 647), a Louisiana law which only allowed property taxpayers to vote on revenue bonds issued by a municipal utility system was declared unconstitutional. Likewise, an Arizona law permitting only real property taxpayers to vote at an election on the issuance of general obligation bonds for various municipal improvements was overturned in *Phoenix* v. *Kolodziejski* (1970). 399 US 204 (90 S Ct 1990, 26 L Ed 2d 523).

In *Evans* v. *Cornman* (1970), 398 US 419 (90 S Ct 1752, 26 L Ed 2d 370), the Court held that residents of the National Institutes of Health, which is a Federal enclave in the State of Maryland, must be allowed to vote in Maryland's elections.

---

13 New York Education Law, § 2012 (Supp 1968).

Defendant contends that all of these cases are distinguishable because they involved an absolute denial of the right to vote, whereas MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]), as it affects students, involves merely a rebuttable presumption against gaining residence.

This, however, is demonstrably not in fact true. Despite the treatment by the United States Supreme Court of *Carrington* as a case involving the denial of the absolute right to vote, it only involved denial of the right to vote in Texas.[14]   All states allow servicemen to vote by absentee ballot.   In contrast, because of the various civilian absentee voters' laws, many students would be unable to register and vote anywhere.   Several states make no provision for absentee ballots,[15] and many others have extremely complicated provisions which discourage instead of encourage voting.   Moreover, with the exception of *Evans* v. *Cornman, supra,* the other cases heretofore cited also involved rebuttable presumptions.   The voters could overcome the presumptions if they owned property or had children in *Kramer,* or if they paid property taxes in *Cipriano* and *Kolodziejski.*   Their task in overcoming the presumption was no more difficult than that faced by many students under the provisions of MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]).   If those voters were denied the right to vote in special elections, they still could vote for every office from president to local officials.   Some students, however, cannot. Because of the interaction of the provisions of MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]) and the provisions of various state absentee-voter laws, the elective franchise is withheld from students.   The ideal of one man-one vote

---

[14] Bullard & Rice, *supra,* at p 232, fn 97.

[15] C. Smith, *Voting & Election Laws* (1960), pp 89–99.

dissolves into the harsh reality of one man but no vote.

Moreover, it is not mandatory that these plaintiffs demonstrate an absolute denial of the right to vote in order to require the state to show a compelling interest. Plaintiffs need only show that a burden has been placed on this precious right in order to avail themselves of the Equal Protection Clause. As Justice Frankfurter stated in *Lane* v *Wilson* (1939), 307 US 268, 275 (59 S Ct 872, 83 L Ed 1281):

"The Amendment [Fifteenth] nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race."

The Equal Protection Clause likewise guards against subtle restraints on the right to vote, as well as outright denial. The United States Supreme Court in recent voting cases has been concerned about the more devious burdens that have been imposed on this most basic of all constitutional rights. In *Williams* v. *Rhodes* (1968), 393 US 23, 30, 31 (89 S Ct 5, 21 L Ed 2d 24), the Court stated:

"But we have also held many times that '*invidious*' distinctions cannot be enacted without a violation of the Equal Protection Clause. * * * In the present situation the state laws place *burdens* on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. * * * So, also, the right to vote is heavily *burdened* if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot. In determining whether the State has power to place

such unequal *burdens* on minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that 'only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.' ". (Emphasis added.)

Thus, the fact that a burden is placed on the right to vote because of the rebuttal presumption contained in MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]), as applied to students, is sufficient to require the state to demonstrate a compelling interest.

## IV.

There are several interests that the state has asserted in cases of this type. The Court of Appeals held that MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]) aids in preserving the purity of elections by insuring that students will not vote twice. 24 Mich App 422, 427. However, the Court of Appeals did not analyze this problem under the compelling interest test. While it may be true that the provisions of subsection (b), as applied to students, does to some minor extent aid in this purpose, that is not sufficient to justify its constitutionality. As the United States Supreme Court stated in *United ed Mine Workers* v. *Illinois State Bar Association* (1967), 389 US 217, 222 (88 S Ct 353, 19 L Ed 2d 426):

"We have therefore repeatedly held that laws which actually affect the exercise of these vital rights cannot be sustained merely because they were enacted for the purpose of dealing with some evil within the State's legislative competence, or even because the laws do in fact provide a helpful means of dealing with such an evil. *Schneider* v. *State,* 308

US 147, [60 S Ct 146, 84 L Ed 155] (1939); *Cantwell v. Connecticut*, 310 US 296 [60 S Ct 900, 84 L Ed 1213, 128 ALR 1352] (1940)."

The Supreme Court in *Carrington* held that the prevention of transients from voting could not justify the Texas law. Moreover, our legislature has provided numerous sanctions which insure the sanctity and purity of elections. Some of the significant provisions include MCLA §§ 168.493, 168.495, and 168.499 (Stat Ann 1956 Rev § 6.1493 and Stat Ann 1971 Cum Supp §§ 6.1495, 6.1499), which provide that a registrant's affidavit of qualification is enforced by misdemeanor sanctions if the registrant does not answer honestly; MCLA § 168.505 (Stat Ann 1971 Cum Supp § 6.1505) which provides that registration officers shall ascertain if the registrant is already registered in another township, etc.; MCLA § 168.508 (Stat Ann 1971 Cum Supp § 6.1508) which allows the clerk to transfer the registration of an elector upon the receipt of reliable information; MCLA § 168.510 (Stat Ann 1971 Cum Supp § 6.1510) which provides that clerks are notified monthly of persons over 21 who have died in the county; MCLA § 168.513 (Stat Ann 1956 Rev § 6.1513) which provides that upon information that the elector has moved from the municipality the clerk may, after notice and time elapsed, cancel the registration, and MCLA § 168.515 (Stat Ann 1956 Rev § 6.1515) which authorizes clerks to make a house to house canvass or "other means" to check correctness of registration cards. Finally, every voter before being given a ballot must execute an application showing his signature and address which is compared to the registration card "and if the same do not correspond the vote of such person shall be challenged." MCLA § 168.523 (Stat Ann 1971 Cum Supp § 6.1523).

Therefore, in view of this complete set of safeguards to insure the purity of the election process, we hold that MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]), insofar as it applies to students, is not necessary to insure the prevention of voting fraud.

The second asserted state interest is that of promoting a concerned and interested electorate. This same interest was asserted unsuccesfully in *Kramer, Cipriano, Evans* and *Kolodziejski.* The provisions of MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]), in regard to students, like § 2012 of the New York laws in *Kramer,* are not sufficiently drawn to insure that only voters who are primarily interested are allowed to vote. As Chief Justice Warren stated in *Kramer:*

"In other words, the classifications must be tailored so that the exclusion of appellant and members of his class is necessary to achieve the articulated state goal. Section 2012 does not meet the exacting standard of precision we require of statutes which selectively distribute the franchise. The classification in § 2012 permits inclusion of many persons who have, at best, a remote and indirect interest in school affairs and, on the other hand, exclude others who have a distinct and direct interest in the school meeting decisions." (P 632.)

Clearly, MCLA § 168.11(a) (Stat Ann 1971 Cum Supp § 6.1011[a]) (the general voter registration statute) will allow many disinterested persons, by any criteria, to vote, while MCLA § 168.11(b), as applied to students, disenfranchises many interested and concerned citizens.

In *Evans, supra,* the Court discussed at length the interests and concerns of the National Institutes of Health residents (p 424):

"Appellants do not deny that there are numerous and vital ways in which NIH residents are affected by electoral decisions. Thus, if elected representatives enact new state criminal laws or sanctions or make changes in those presently in effect, the changes apply equally to persons on NIH grounds * * * Further, appellees are as concerned with state spending and taxing decisions as other Maryland residents, for Congress has permitted the States to levy and collect their income, gasoline, sales, and use taxes—the major sources of state revenues—on federal enclaves. See 4 USC §§ 104–110. State unemployment laws and workmen's compensation laws likewise apply to persons who live and work in federal areas. See 26 USC § 3305(d); 40 USC § 90. Appellees are required to register their automobiles in Maryland and obtain driver's permits and license plates from the state; they are subject to the process and jurisdiction of state courts; they themselves can resort to those courts in divorce and child adoption proceedings; and they send their children to Maryland public schools."

In *Phoenix* v. *Kolodziejski, supra,* the Court considered the relationship of property owners and those who rent property (like some of the appellants), and stated at p 210:

"Property taxes may be paid initially by property owners, but a significant part of the ultimate burden of each year's tax on rental property will very likely be borne by the tenant rather than the landlord since, as the parties also stipulated in this case, the landlord will treat the property tax as a business expense and normally will be able to pass all or a large part of this cost on to the tenants in the form of higher rent."

Turning to the facts of this case, we see that students have just as many connections with the community as those found by the Supreme Court

in *Evans* and *Kolodziejski*. Students, like the National Institutes of Health residents, are included in the census determination of the state's congressional apportionment.[16] Students, of course, are subject to the state's laws and regulations. Jury lists are chosen from lists of registered voters.[17] Thus, by denying students the right to register and vote, they are also denied participation in the time honored Anglo-Saxon tradition of trial by a jury of their peers.[18] Students pay state income tax, city income tax (if any), gasoline, sales and use taxes. Michigan law provides a rebate of one-eighth of the sales tax revenue to counties and cities on a per capita basis[19] and a rebate of 20% of gasoline tax revenue on a combined population-highway mileage basis.[20] Clearly, without the students who are counted as residents for these purposes, the cities and counties would lose part of these rebates. As the United States Supreme Court has recognized,[21] property taxes are ultimately paid by renters such as some of the appellants. In addition, Michigan explicitly recognizes this fact by allowing all renters a 17% exemption on rent paid in lieu of the exemption that property owners receive for payment of property taxes.[22] Students with children can and do enroll them in the public school system, and, therefore, have more than a passing

[16] 398 US at 421 (90 S Ct at 1754, 26 L Ed 2d at 374).

[17] MCLA § 600.1310 *et seq.* (Stat Ann 1971 Cum Supp § 27A.1301 *et seq.*).

[18] *Glasser* v. *United States* (1942), 315 US 60 (62 S Ct 457, 86 L Ed 2d 680).

[19] MCLA § 205.75 (Stat Ann 1971 Cum Supp § 7.546).

[20] MCLA §§ 247.660, 247.663 (Stat Ann 1971 Cum Supp §§ 9.1097 [10], 9.1097[13]).

[21] 399 US at 210 (90 S Ct at 1994, 26 L Ed 2d at 528). For a discussion of the problems of attempting to discern the long range effect of property taxes on property values, see 399 US at 211 and C. Shoup, Public Finance, 385–390 (1969).

[22] MCLA § 206.258(2) (Stat Ann 1971 Cum Supp § 7.557[1258]) and Bullard & Rice, *supra*, at p 233.

interest in the educational standards of the community.

The Federal government grants deductions on the Federal tax for state and local taxes in lieu of itemized deductions. These deductions vary from state to state.[23] Hence, if a student whose parents are from New York, goes to the University of Michigan and lives in Ann Arbor, he would take a deduction based on Michigan and not New York taxes. Thus, he is implicitly recognized as a Michigan resident for Federal tax purposes. The Federal government further provides community health service grants to the states based on population (which includes students).[24]

This list is not exhaustive but merely shows some of the numerous interrelationships between students, their local communities, and the State of Michigan. Moreover, there are other groups more transient than students who are not required to meet the provisions of subsection (b) as are students. According to the 1960 census, the largest group of transients were operative and kindred workers with craftsmen and foremen second, and professionals (including students) third.[25]

Thus, we hold that students cannot be denied the right to vote under the provisions of MCLA § 168.11 (b) (Stat Ann 1971 Cum Supp § 6.1011[b]) because of the state's interest promoting an informed and concerned electorate. There is every reason to believe they might be even better informed on current issues than other citizens.

---

[23] 1970 Federal income tax form; 1970 Optional State sales tax table.

[24] 42 USCA § 246(a)(3)(A). "The Student Vote," New Republic, 11 (Sept 19, 1970).

[25] J. Schmidhauser, *Residency Requirements for Voting and The Tensions of a Mobile Society.* 61 Mich L Rev 823, 830, fn 10.

## V

Courts do not exist in a vacuum. They may take cognizance of facts and events surrounding the passage and purpose of legislation. *Traverse City School District* v. *Attorney General* (1971), 384 Mich 390, 405. As Mr. Justice Field stated in *Ho Ah Kow* v. *Nunan* (USCC, 1879), 12 Fed Cases 252, 255:

"Besides, we cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness and forbidden to know as judges what we see as men."

We thus may take judicial notice of extrajudicial material in recognizing other state interests. An article[26] in *The Wall Street Journal* of April 15, 1971, discusses the issue raised in this and similar cases around the country. A purported fear of the states involved is that the students would have a significant political impact if they were granted the elective franchise. The article quoted an Illinois State Representative as summing up the feelings of many citizens thusly: " 'For goodness sakes, we could have these transients actually controlling the elections, voting city councils and mayors in or out of office.' " This fear of student voters overwhelming the townspeople at the polls was underlying the decision of our Court in *Wolcott* v. *Holcomb* (1893), 97 Mich 361, 367, 368. However, what was constitutionally acceptable in 1893 is not necessarily constitutionally acceptable today. As the United States Supreme Court stated in *Harper* v. *Virginia Board of Elections* (1966), 383 US 663, 669 (86 S Ct 1079, 16 L Ed 2d 169):

---

[26] A. Otten, "Should Collegians Vote at Home or at School?" *The Wall Street Journal*, April 15, 1971 (p 1).

"Likewise, the Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights."

The Court went on to point out that the segregation upheld in *Plessy* v. *Ferguson* (1896), 163 US 537 (16 S Ct 1138, 41 L Ed 256), was overruled a half century later. Likewise, the restrictions on the franchise accepted in the mid-nineteenth century are not necessarily to be tolerated today. Under the Michigan Constitution of 1835, only 21-year old white male citizens could vote.[27] The Constitution of 1850, by amendment, removed the restriction of race[28] and by an amendment to the 1908 Constitution, the restrictions based on sex were removed.[29] Recently, Congress by statute,[30] and more recently by the adoption of constitutional amendment,[31] the voting age in all elections has been lowered to 18 years.

de Tocqueville over a century ago stated:

"There is no more invariable rule in the history of society: The further electoral rights are extended, the greater is the need for extending them: for after each concession the strength of democracy increases, and its demands increase with its strength."[32]

---

[27] Const 1835, art 2, § 1.

[28] Const 1850, art 7, § 1.

[29] Const 1908, art 3, § 1.

[30] Voting Rights Act amendment of 1970, 42 USCA 1973aa—1973bb–4.

[31] On June 30, 1971, the State of Ohio became the 38th State to approve the amendment. The amendment became law upon the ratification of three-fourths of the States. US Const, art 5.

[32] A. de Tocqueville, 1 Democracy in America 57 (Knopf. ed. 1956).

We agree that it is no longer constitutionally permissible to exclude students from the franchise because of the fear of the way they may vote.

" 'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible.   '[T]he exercise of rights so vital to the maintenance of democratic institutions,' (*Schneider* v. *State* [1937], 308 US 147, 161 [60 S Ct 146, 84 L Ed 155]) cannot constitutionally be obliterated because of a fear of the political views of a particular group of bona fide residents." *Carrington* v. *Rash, supra,* at p 94.

Fears have been expressed in the past when new groups have been granted the franchise, and these fears have proven to be largely unfounded.   The fear that students will vote radically different from the bulk of the electorate is problematical at this point.[33]   However, as the United States Supreme Court stated in *Williams* v. *Rhodes* (1968), 393 US 23, 32 (89 S Ct 5, 21 L Ed 2d 24) : "Competition in ideas and governmental policies is at the core of our electoral process  *  *  *  ." The right to vote means the right to vote for the candidate of one's choice regardless of ideology.   As Justice Jackson stated in another case concerning the right of dissent :

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in *politics,* nationalism, religion, or other *matters of opinion*  *  *  *  ." (Emphasis added.)   *West Virginia Board of Education* v. *Barnette* (1943), 319 US 624, 642 (63 S Ct 1178, 87 L Ed 1628, 147 ALR 674).

---

[33] Bullard & Rice, *supra,* at p 236: "A recent American Council on Education survey of college freshmen showing that forty-four percent considered themselves liberal and twenty percent moderate conservative demonstrates that students would not vote as a solid unit. New York Times, Dec. 22, 1970, at 16, col. 4."

The right to vote has been considered to be the most vital of our constitutional rights. The cry of the American revolution of "no taxation without representation" articulated the desire of the colonists to have a voice in selecting the officials who made the decisions affecting their daily lives. At the present time, these students in many instances are being taxed without being represented. Therefore, we hold that MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]), as it applies to students, is unconstitutional as a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. We further hold that the provisions of MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]) applying to students are unconstitutional as a violation of art 1, § 2, of the Michigan Constitution of 1963.

In the future, students must be treated the same as all other registrants. No special questions, forms, identification, etc., may be required of students.

Article 1, § 1, of the Michigan Constitution of 1963 states that, "All political power is inherent in the people." This power resides in all of the people, student and nonstudent, alike.

The judgment is reversed and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

T. M. Kavanagh, C. J., and Black and T. G. Kavanagh, JJ., concurred with Swainson, J.

T. E. Brennan, J. (*concurring*). I agree with the result reached by my Brother Swainson, but would base my opinion on statutory construction rather than constitutional grounds.

The rule is that if a statute can be construed so as to avoid constitutional invalidity, the constitutionally valid construction is to be preferred.

Const 1850, art 7, § 5, which contained a provision similar to MCLA § 168.11(b) (Stat Ann 1971 Cum Supp § 6.1011[b]), was the subject of divided opinions in this Court in *Wolcott* v. *Holcomb* (1893), 97 Mich 361.

The dissenting opinion by Chief Justice HOOKER, concurred in by Justice LONG concluded that the provision simply meant that a student was not to be deemed to have lost his residence *automatically* by reason of being a student.   In short, HOOKER and LONG believed that the proviso gave the student an option, his intention in the matter being controlling. He said it this way:

"The true construction of this section should be just what its language imports, *i.e.*, that being kept in an alms-house, or attendance at college, or employment in the service of the United States, or the navigation of the lakes or high seas, does not work a change of residence against the intention or desire of the individual." *Wolcott* v. *Holcomb, supra,* p 371.

That construction of the act was wise, reasonable, just and proper.   It should have been the majority opinion in 1893.   It should be today.

If a student in residence is given the "HOOKER option", all the senseless folderol of voter registration in some of our college towns would be dispensed with.

HOOKER's words, written in dissent almost 80 years ago, need no gilding, but bear resonant repetition.

"The only reasons given for the construction contended for are that these classes are undesirable voters at the place of the asylum; that they pay no taxes, do no work for the benefit of the municipality, and have no interest in local affairs.   The same may be said of many persons in all localities, and was probably as true of these before their admission as

after. It is as true of those admitted from the locality of the asylum, who may vote under this section, as of those who come from a distance, who may not vote under this construction. It never has been a requisite to electoral rights that the citizen should pay taxes, do work for the benefit of the municipality, or evince interest in municipal affairs; nor does the right depend upon a wise or even honest exercise of the privilege of the ballot. Doubtless there are many whose votes could be dispensd with to the profit of their respective municipalities and the State as well, but the electoral franchise is based upon broader principles. There is no man so poor or low that he is not richer and manlier for his political equality, and the ballot is essential to the protection of the rights of all classes. Immediately a class or race is disfranchised, its members are deprived of an equal chance with their fellows. This proposition is so important a part of the foundation of our institutions that it should not be eliminated or weakened by any unnecessary construction of a constitution based upon civil liberty and political equality." *Wolcott* v. *Holcomb, supra,* pp 370, 371.

I concur in reversal.

Williams, J., concurred with T. E. Brennan, J.

Williams, J. (*concurring with* T. E. Brennan, J.). I concur with my Brother T. E. Brennan. However, I agree with my Brother Swainson's constitutional analysis.

Adams, J. (*concurring*). I concur in reversal. There is no rational basis for treating students differently from other citizens in their exercise of the fundamental right to vote. The Michigan statute defining voting residence for all citizens provides that: "Should a person have more than 1 residence, * * * that place at which such person resides the

greater part of the time shall be his or her official residence * * * ." MCLA § 168.11(a) (Stat Ann 1971 Cum Supp § 6.1011[a]).

For voting purposes, there is no rational basis for distinguishing between students who reside at a given locality for nine months of the year and non-students who reside in the same locality for nine months of the year. Requiring additional qualifications to vote which affect different groups unequally, whether by income, occupation, or employer, is a denial of equal protection. *Harper* v. *Virginia Board of Elections* (1966), 383 US 663 (86 S Ct 1079, 16 L Ed 2d 169); *Carrington* v. *Rash* (1965), 380 US 89 (85 S Ct 775, 13 L Ed 2d 675); *Evans* v. *Cornman* (1970), 398 US 419 (90 S Ct 1752, 26 L Ed 2d 370). Special treatment of students is an arbitrary and invidious discrimination against them in violation of art 1, § 2, Michigan Constitution, and Am 14, United States Constitution. *Fox* v. *Employment Security Commission* (1967), 379 Mich 579.