Cavanagh, J.
I. respectfully disagree with the majority’s conclusion that a cause of action created by defendant’s city charter and brought against the city of Detroit would contravene the governmental tort liability act (gtla), MCL 691.1407. I further object to the majority’s assertion that plaintiff must plead in avoidance of governmental immunity.
In reaching its holding, the majority disregards the foundational principles of our adversarial system of adjudication. As protectors of justice, we refrain from deciding issues without giving each party a full and fair opportunity to be heard. But not for this concern, the judicially created doctrine of standing would be discarded, as it ensures “concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination . . . .” Baker v Carr, 369 US 186, 204; 82 S Ct 691; 7 L Ed 2d 663 (1962) (Brennan, J.). However, the majority has disregarded such considerations, misconstruing the proper scope of its authority, by making dispositive an issue never argued or briefed by the parties. Neither of the parties has had the benefit of sharing with this Court their thoughts on the effect of the tort immunity act on this case, though the implications of the majority’s holding are vast. Never before have I witnessed such overreaching conduct from members of this Court.
I. THE GTLA DOES NOT NULLIFY PRIVATE ACTIONS CREATED BY A CITY
In the majority’s haste to apply the gtla, it fails to adequately consider several foundational issues. First, *214 the majority neglects to properly address a dispositive preliminary issue: is an action alleging a violation of a city charter a tort? Neither plaintiff nor defendant considered this claim a tort. Further, because a charter is a city’s “constitution,” Bivens v Grand Rapids, 443 Mich 391, 401; 505 NW2d 239 (1993), this action does not resemble our typical understanding of a tort. It is far from clear that the Legislature intended that the gtla preclude such actions, and the majority’s reference to Donajkowski v Alpena Power Co, 460 Mich 243, 247; 569 NW2d 574 (1999), which proclaimed in the most cursory fashion that a statutory violation sounds in tort, does not aid in this determination. At the very least, briefing and argument on this issue could have clarified the nature of the debate.
Moreover, the majority’s claim that the scope of the gtla nullifies any attempt by a city to create a cause of action that could be brought against a governmental agency ignores the fact that the tort immunity act does not bar gross negligence claims against government officers, MCL 691.1407(2), nor does it prohibit actions brought against government entities for injuries arising out of actions not related to the discharge of a “government function.” MCL 691.1407(1). Thus, even if one concludes that plaintiff’s claim against the city properly sounds in negligence, a cause of action created by the Detroit charter could be brought under the theory of gross negligence against government officers or against the city when not engaged in a government function. Therefore, the majority errs in concluding that any action created by a city’s charter that could be brought against a governmental entity would violate the gtla.
*215 n. THE CHARTER CREATES A CAUSE OF ACTION
Having demonstrated why the issue is not “irrelevant,” in spite of the majority’s assertions otherwise, I believe it is necessary to clarify that the plain language of the charter creates a cause of action.[1]
The Detroit citizenry clearly has the right to be free from discrimination on the basis of, inter alia, sexual orientation:
The city has an affirmative duty to secure the equal protection of the law for each person and to insure equality of opportunity for all persons. No person shall be denied the enjoyment of civil or political rights or be discriminated against in the exercise thereof because of race, color, creed, national origin, age, handicap, sex, or sexual orientation. [Charter of the city of Detroit, Declaration of Rights, §2.]
Defendant city of Detroit, however, claims the plain language of the charter prescribes an exclusive administrative remedy for this broadly pronounced right, prohibiting enforcement by its citizenry:
The city may enforce this declaration of rights and other rights retained by the people. [Id. at § 8.]
Defendant’s cursory assertion that this provision prohibits individual enforcement of the rights granted in the charter results from an erroneous interpretation of the plain language of the text.[2] Certainly this provision grants the city the authority to enforce the rights *216 proclaimed in the charter. However, this grant of authority is not exclusive. The drafters gave the city the power to enforce the declaration of rights and other rights retained by the people. If one accepts defendant’s claim that this text gives the city the exclusive authority to enforce the declaration of rights, the drafters also would have granted to the city the exclusive authority to enforce “other rights retained by the people.” In other words, with the adoption of the charter as constructed by defendant, the people of Detroit purportedly stripped themselves of their ability to bring civil actions to enforce any “other right.” Even if the city had the authority to enforce these rights, the text simply does not support such an unprecedented grant of authority.
Further, the drafters used “may,” not “shall,” in this provision. “May” suggests that one “is permitted to” or has discretion. Black’s Law Dictionary (7th ed). If the drafters had intended to grant the city the exclusive authority to enforce the charter, they certainly would have used “shall,” mandating such action. Id. (“shall” implies a duty or requirement). Moreover, the citizens of Detroit surely did not intend to grant the city the discretionary and exclusive power to enforce both the rights under the charter and all others retained by the people. Thus, by use of the permissive and discretionary term, the drafters indicated an intention to permit enforcement mechanisms beyond those powers granted to the city. Any other interpretation ignores the text of the charter.
Reference to the city’s ordinances supports this interpretation of the charter.[3] In 1988, the city deliber *217 ately clarified that those who experienced discrimination on the basis of aids and conditions related to aids could bring a civil action to enforce their rights granted by the city. Chapter 27, article 7 prohibits such discrimination in the employment, housing, business, and educational arenas. See, generally, §§ 27-7-1 to 27-7-90. In particular, the charter prohibits discrimination in the provision of public facilities or services. Section 27-7-7. The enforcement provision includes the following subsection:
Any aggrieved person may enforce the provisions of this article by means of a civil action. [Section 27-7-10(a).]
Clearly, the city intended to create a civil cause of action for the victims of such discriminatory practices. Assuming drafters of the ordinance did not intend to contravene the charter, which we must, we may only conclude that the authority granted to the city in the declaration of rights, § 8, did not give the city the sole right to enforce the charter.
Although defendant correctly referenced ordinance 27-7-10, it draws the wrong conclusion. As noted, article 7 of chapter 27 was enacted in 1988. Detroit Ordinance § 24-88, July 14, 1988; see also Detroit Ordinance § 33-88, September 21, 1988. In contrast, the enabling ordinances at issue here were enacted in 1979. Detroit Ordinance § 303-H, January 24, 1979. It is entirely reasonable to conclude that the city simply intended to clarify that a private cause of action could be had under the charter when enacting § 27-7-10, as had been authorized implicitly by the charter.
*218 The inclusion of § 27-2-10 was particularly appropriate because of the circuit courts’ treatment of similar claims. In this case, for example, the court noted that this issue had arisen in the past. Without direction from the Court of Appeals, the trial court refused to recognize a cause of action. Certainly an ordinance or charter amendment that made clear that a cause of action existed for a violation of any right provided by the charter would have made this exercise even simpler. However, its absence cannot force the conclusion that an action only for AIDS-related discrimination was intended. In this age of the overly rhetorical and often vacuous concern over “special rights,” it is unreasonable to presume the charter permits individual actions for AIDS-related discrimination, but not for the other forms of discrimination enumerated in the declaration of rights, § 2. Therefore, though we often rely on the maxim that the inclusion of one term implies the exclusion of another, that inference loses force where the circumstances indicate otherwise.[4] In this case, the circumstances suggest the opposite, i.e., that the express provision of a cause of action for AIDS-related discrimination only clarifies that the charter permitted such actions for all violations.
Additional support for this conclusion can be found in the drafters’ decision to include two provisions that suggest that Detroit’s citizens retained the right to sue for violations of the charter. The declaration of rights clearly states:
*219 The enumeration of certain rights in this Charter shall not be construed to deny or disparage others retained by the people. [Declaration of Rights, § 7.]
In that same vein, the charter’s chapter on human rights ends with the following proclamation:
This chapter shall not be construed to diminish the right of any party to direct any immediate legal or equitable remedies in any court or other tribunal. [Section 7-1007.]
This evidence indicates an intention to create a scheme whereby the administrative remedies supplement an individual’s ability to bring a private cause of action.[5] In light of this analysis, a rational inteipreter must conclude that neither the drafters nor the citizenry intended to grant the city exclusive, discretionary authority to remedy violations of the rights granted in the charter. Therefore, I would hold that the charter does, in fact, create a damages action for discrimination based on sexual orientation.
DI. IMMUNITY AS AN AFFIRMATIVE DEFENSE
The majority has opportunistically seized on the circumstances presented in this case to overrule decades of sound precedent and unsettle an area of law that had finally achieved some stability. In pro *220 claiming that plaintiff must plead in avoidance of immunity, the majority ignores not only the value of precedent, but also the sound principles on which McCummings v Hurley Medical Ctr, 433 Mich 404; 446 NW2d 114 (1989), was based. In McCummings, the Court held that the entity claiming immunity must affirmatively plead the defense. This unanimous pronouncement was based, in part, on the doctrine’s statutory foundation. No longer could we solely rely on the doctrine’s common-law history to determine the parameters of the defense.[6] Therefore, though the judiciary traditionally considered sovereignty a “characteristic” of government, this understanding was no longer dispositive of procedural or substantive issues once the Legislature codified the doctrine. This view is no less relevant today, and the majority’s attempt to proclaim otherwise by once again relying on outdated jargon adds little to our understanding of governmental immunity.
Having identified a flaw in the majority’s deceptively useful rationale (i.e., because the Court has declared immunity a “characteristic” in the past, it is not an affirmative defense), we must now turn to its substantive conclusions. Does the governmental immunity statute require that plaintiffs plead in avoidance of immunity? MCL 691.1407(1) provides: *221 Although this section makes clear that governmental entities may claim immunity when performing a governmental function, it does not, as the majority claims, create a textual presumption in favor of the government. Rather, the statute identifies the scope of immunity. The procedural duty to plead is simply not mentioned, and as such, the text-as it pertains to pleading-is silent.
*220 Except as otherwise provided in this act, a government agency is immune from tort liability if [it] is engaged in the exercise or discharge of a governmental function.
*221 Building on this Court’s pronouncement in Ross v Consumers Power Co (On Rehearing), 420 Mich 567; 333 NW2d 641 (1984), which clarified that the Legislature intended that immunity from tort liability exist only when an entity was engaged in a governmental function, the McCummings Court arrived at the most logical conclusion, i.e., that “[t]he question whether a governmental agency was engaged in a governmental function when performing the act complained of is a question best known to the agency and best asserted by it.” Id. at 411.[7] Furthermore, the McCummings Court correctly noted that no valid reason to exempt agencies from the pleading burden placed upon individuals could be discerned. The source of immunity for both government bodies and individuals is grounded in § 1407. Because the text makes no distinction in this regard, a prudent observer will agree that the majority’s reversal is based on its own policy considerations, which ignore both the intent of the Legislature and the judicially sound doctrine of stare decisis. This is particularly true because, though the *222 Legislature revised the GTLA after McCummings in 1986, 1996, and 1999, it failed to amend the statute to alter the rule that placed the burden of pleading on the government. Unfortunately, the majority dismisses this legislative acquiescence, an indicator of its intent.
In sum, the fact remains that governmental immunity is a defense to liability. Although the majority erroneously declares that plaintiff must plead in avoidance of the doctrine, the government continues to bear the onus of proof. If a trial court finds the parties have equally carried the burden of production concerning the applicability of the doctrine, the court must find for the plaintiff. Any indication to the contrary in the majority’s opinion may only be referenced as dicta, as the issue this case presents is limited to the sufficiency of the pleadings.
Shockingly, without the issue being contemplated, let alone raised by the parties, the majority concludes that plaintiff’s claim should have been dismissed for its failure to plead in avoidance of government immunity. Ante at 190, 205, 212. However, our precedent and court rules had expressly placed this burden on the government. I object to the majority’s application of its holding, which placed the burden of prescience on plaintiff.
IV. PRINCIPLES OF THE ADVERSARY SYSTEM
The majority’s disingenuous response to the dissenting opinions requires clarification. The majority claims that any briefing on the propriety of the rule in McCummings would be a waste of time because “additional briefing would not assist this Court in addressing this question of law.” Ante at 206. This *223 comment flies in the face of the foundations of our adversarial system, in which the parties frame the issues and arguments for a (presumably) passive tribunal. The adversarial system ensures the best presentation of arguments and theories because each party is motivated to succeed. Moreover, the adversarial system attempts to ensure that an active judge refrain from allowing a preliminary understanding of the issues to improperly influence the final decision. This allows the judiciary to keep an open mind until the proofs and arguments have been adequately submitted.[8] In spite of these underlying concerns, the majority today claims that the benefits of full briefing are simply a formality that can be discarded without care. The majority fails to comprehend how the skilled advocates in this case could have added anything insightful in the debate over the proper interpretation of a century’s worth of precedent. Whatever its motivation, the majority undermines the foundations of our adversarial system.
The majority also implies that the “central question in this case was whether the charter’s purported creation of a cause of action for sexual orientation discrimination is preempted” by the gtla. Ante at 206. However, the extent of the parties’ preemption briefing focused solely on the relevance of the Civil Rights Act vis-a-vis the charter-created cause of action. Moreover, the questions by this Court during oral argument do not substitute for proper briefing, but only illustrate how the Court pursues its own end in a fashion unanticipated by the parties.
*224 While occasionally a court may find it necessaiy to resolve an issue not briefed by the parties, the frequency with which the majority undertakes such activist endeavors demonstrates its desire to arrive at its destination.[9]
*225 V. CONCLUSION
Because a majority of this Court erroneously refuses to recognize that the charter creates a cause of action and that plaintiff need not plead in avoidance of immunity, there is no need to thoroughly analyze the remaining issues. Suffice it to say, I would hold that a municipality has the power, on the basis of the police powers inherent in its home rule authority, to protect its citizens from discrimination. No state law preempts this protection, and governmental immunity does not bar an action based not on a theory of tort liability, but on a violation of the organic law of a city granting its citizens fundamental rights. Therefore, for the reasons noted, I would affirm the judgment of the Court of Appeals.
Kelly, J., concurred with Cavanagh, J.
Weaver, J. I dissent from the majority decision.
*226 The majority has decided important issues involving governmental immunity that were not raised or briefed by the parties and that are very significant to the people of Detroit and all the people of Michigan. The majority should have insured that it had briefing and heard argument on these issues before deciding them.
A
Without the benefit of briefing or argument, the majority overrules settled precedent[1] to hold that governmental immunity cannot be waived because it is a characteristic of government. In McCummings v Hurley Medical Ctr, 433 Mich 404, 411; 466 NW2d 114 (1989), this Court held that governmental immunity must be pleaded as an affirmative defense. The majority overrules McCummings and holds that immunity is an unwaivable characteristic of government. The parties did not raise or address in any court whether governmental immunity is a characteristic of government or an affirmative defense.[2]
While the general concept of governmental immunity was alluded to in questioning during oral argument before this Court, the questioning did not refer *227 ence the concept of immunity as a characteristic of government and did not foreshadow an intent to reconsider McCummings. The majority’s decision to reach out and overrule a case that was not raised, briefed, or argued is certainly efficient. However, the majority’s efficiency in this case forsakes procedural fairness. It is worth emphasis that the majority can only conclude that the city has not waived governmental immunity by overruling McCummings.
I decline the majority’s invitation to take a position without briefing and argument on whether governmental immunity is a characteristic of government, an affirmative defense, or some other judicially determined hybrid. These characterizations have significant procedural consequences. It is the role of the Court to respond to issues properly before it and to seek additional briefing and argument on significant matters that may have been overlooked by the parties. This is especially true where the issues are of great importance, such as the issues not briefed or argued in this case, which seriously affect the settled law of this state.
The majority’s decision to address and resolve this issue without briefing or argument is inappropriate. Before deciding this significant change in the law of governmental immunity, the Court should have had briefing and argument.
B
The question whether a charter-created cause of action for sexual orientation discrimination conflicts with the governmental tort liability act (gtla), MCL 691.1407, a question that the majority concludes *228 decides this case, was not briefed or argued by the parties at any level.[3] It is not possible to agree with the majority contention that this specific question was “squarely in front of the parties” when neither party addressed it at any level. Ante at 206. The conflict analysis of the parties and the courts below addressed whether a charter-created cause of action for sexual orientation discrimination conflicted with the Civil Rights Act (cra). Furthermore, the city only characterized the question of conflict with CRA as one premised on the law of preemption in its brief to this Court. It is again worthy of note that it is only the majority’s overruling of McCummings that allows the majority to shift the focus of the conflict analysis from the cra to the gtla.
c
Although the majority asserts that whether the electors of Detroit intended to create a cause of action to vindicate the charter-created civil right to be free from sexual orientation discrimination is an “irrelevant” inquiry, the intent of the electors, as expressed in the charter is noteworthy.[4] After all, the issue presented at the outset of this case was whether the charter language created a cause of action to vindicate the charter’s declaration of rights.
The charter’s declaration of rights provides:
*229 The city has an affirmative duty to secure the equal protection of the law for each person and to insure equality of opportunity for all persons. No person shall be denied the enjoyment of civil or political rights or be discriminated against in the exercise thereof because of race, color, creed, national origin, age, handicap, sex, or sexual orientation. [Section 2.]
The language of § 2 is not ambiguous. It, as would be commonly understood by the ratifiers, secures a set of rights to each person of Detroit. Furthermore, § 8 of the declaration of rights provides:
The city may enforce this Declaration of Rights and other rights retained by the people.
While it can be argued that the permissive “may” of § 8 tempers the city's otherwise “affirmative duty” under § 2 to “insure the equality of opportunity for all persons,” it is by no means clear that, pursuant to § 8, the ratifiers intended to diminish the individual rights declared in § 2. More importantly, the unambiguous language of the charter demonstrates that the charter ratifiers, the electors of Detroit, intended that the people of Detroit have the opportunity to seek enforcement of their charter-based rights in the proper court or tribunal. Art 7, ch 10, § 7-1007 provides:
This chapter shall not be construed to diminish the right of any party to direct any immediate legal or equitable remedies in any court or other tribunal.
By these words the ratifiers of the charter would have expected that individuals could also vindicate their charter-declared rights in the proper court or tribu *230 nal.[5] In other words, it was the express intent of the electors of Detroit to raise the veil of immunity within the city limits with respect to the civil rights declared in the charter’s declaration of rights.
The fact that the majority’s decision leaves a charter-based right with no remedy[6] accentuates the inappropriateness of the majority’s decision to dispose of this case on the basis of issues that were not raised, not briefed, and not argued by the parties.
Kelly, J., concurred with Weaver, J.

 See Detroit v Walker, 445 Mch 682, 691; 520 NW2d 135 (1994) (“The prevailing rules regarding statutory construction are well established and extend to the construction of home rule charters”).

 This Court has certainly consistently eschewed any deviation from our “textualist” approach.

 Brady v Detroit, 353 Mich 243, 248; 91 NW2d 257 (1958) (“Provisions pertaining to a given subject matter must be construed together, and if *217 possible harmonized. It may not be assumed that the adoption of conflicting provisions was intended”).

 See Luttrell v Dep’t of Corrections, 421 Mich 93, 102; 365 NW2d 74 (1984) (holding that “the effect of the rale 'expressio unius est exclusio alterius,' while a valid maxim, [may be] so much at odds with the other [rales of construction] that reason dictates it [may be] inapplicable”).

 The charter’s preamble provides additional support for the conclusion that the charter created both rights and remedies to which the city itself must adhere:
We, the people of Detroit, do ordain and establish this Charter for the governance of our city, as it addresses the programs, services and needs of our citizens; . . . pledging that all our officials, elected and appointed, will be held accountable to fulfill the intent of this Charter .... [Emphasis added.]

 See Const 1963, art 3, § 7 (“The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed”).

 The Court in Ross undertook an almost impossible task, clarifying more than a century’s worth of judicial and legislative commentary on governmental immunity. It did not, however, examine on which party the burden of pleading should fall. Any reference to that burden in Ross does not, contrary to the majority’s assertions, diminish the foundation on which the Court in McCummings relied.

 See Hazard, Ethics in the Practice of Law, pp 120-123, 126-129, 131-135, cited in Hdmarsh & Trangsrad, Complex Litigation and the Adversary System (New York: Foundation Press, 1988).

 The majority frequently engages in at least three distinct types of activist behavior: overruling precedent; in grants of leave, directing parties to address issues not initially raised or briefed by the parties in their application for leave to appeal; and, as in this case, holding dispositive issues neither raised nor argued before this Court.
To review instances where this majority has overruled precedent, see, e.g., People v Cornell, 466 Mich 335; 646 NW2d 127 (2002); Koontz v Ameritech Services, Inc, 466 Mich 304; 645 NW2d 34 (2002); Robertson v DaimlerChrysler Corp, 465 Mich 732; 641 NW2d 567 (2002); Pohutski v City of Allen Park, 465 Mich 675; 641 NW2d 219 (2002); Hanson v Mecosta Co Rd Comm’rs, 465 Mich 492; 638 NW2d 396 (2002); Brown v Genesee Co Bd of Comm’rs, 464 Mich 430; 628 NW2d 471 (2001); People v Glass, 464 Mich 266; 627 NW2d 261 (2001); Nawrocki v Macomb Co Rd Comm, 463 Mich 143; 615 NW2d 702 (2000); Mudel v Great Atlantic & Pacific Tea Co, 462 Mich 691; 614 NW2d 607 (2000); Stitt v Holland Abundant Life Fellowship, 462 Mich 591; 614 NW2d 88 (2000); Robinson v Detroit, 462 Mich 439; 613 NW2d 307 (2000); People v Kazmierczak, 461 Mich 411; 605 NW2d 667 (2000); McDougall v Schanz, 461 Mich 15; 597 NW2d 148 (1999); People v Lukity, 460 Mich 484; 596 NW2d 607 (1999); Ritchie-Gamester v Berkley, 461 Mich 73; 597 NW2d 517 (1999).
For examples of grant orders which directed the parties’ to address issues the majority found relevant, see People v Glass, 461 Mich 1005; 610 NW2d 872 (2000) (directing the parties to address whether the prosecutor’s actions removed the taint of alleged racial discrimination in the grand jury selection process, whether MCR 6.112 conflicted with MCL 767.29, and whether the Court properly exercised its authority over criminal procedure). See also People v Hardiman, 465 Mich 902; 638 NW2d 744 (2001) (directing the parties to brief whether “the inference upon inference rule of People v Atley, 392 Mich 298 (1974), was violated under the facts . . . and whether that decision should be overruled”); People v Johnson, 465 Mich 911; 638 NW2d 747 (2001) (directing the parties to brief whether this Court should adopt the federal subjective entrapment defense); People v Reese, 465 Mich 851; 631 NW2d 343 (2001) (directing the parties to “specifically address whether MCL 768.32 prevents this Court from adopting the federal model for necessarily lesser included offense instructions and, if it does, whether such prohibition violates Const 1963, art 6, § 5. In all other respects, leave to appeal is denied.”); People v Lett, 463 Mich 939, 620 NW2d 855 (2000) (rejecting the prosecutor’s concession concerning the constitutional nature of the error and directing the parties to address whether the trial court’s declaration of a *225 mistrial was based on manifest necessity; further ordering the parties to address six additional issues, including whether the defendant’s claim was forfeited or waived and the extent to which the law might be clarified concerning presence of manifest necessity).
I thank the majority for pointing out that I object both when the parties have not had an opportunity to argue or brief an issue, and when the majority has forced the disposition of an issue not raised by either party. To clarify, it’s not that I wish to have “it both ways,” but that I object to judicial activism in any form.
Further, the majority accurately documents that, throughout my twenty-year tenure on this Court, I have, on occasion, found it necessary to overrule precedent or request briefing on an issue. The majority also clarifies that policy considerations may influence one’s understanding of the appropriate method by which to apply or interpret the law. With this I do not disagree. Neither the majority nor I can escape the fact that, as judges, we are not computers, but human beings, doing our best to apply the law in an unbiased fashion, in accord with our constitutional mandate and within the strictures of the adversary system. Whether in the majority or the dissent, every justice must recognize and appropriately set aside such considerations in the execution of their duties under the law.

 The minority's assertion that McCummings is an “aberration” is their view. However, it was signed by six justices with Justice Ghiefin concurring separately and has been the law for fourteen years. See, e.g. Scheurman v Dep’t of Transportation, 434 Mich 619; 456 NW2d 66 (1990), and Tryc v Michigan Veterans’ Facility, 451 Mich 129; 545 NW2d 642 (1996).

 Although the city raised governmental immunity as an affirmative defense at the trial court level, the city never specifically addressed immunity relative to plaintiff’s charter-based claim of sexual orientation discrimination at any level. The only briefing regarding immunity in the trial court was in response to plaintiff’s intentional infliction of emotional distress claim. Plaintiff abandoned that claim in the trial court and thereafter, the city abandoned its immunity claim.

 The Michigan Constitution and the Home Rule City Act require that home rule city charters not conflict with state law.

 Further, it should be of interest to the people of Detroit that the city’s position in this litigation seeks to disclaim individual rights that its electors deemed worthy of charter protection.

 As reiterated by the United States Supreme Court in Davis v Passman, 442 US 228, 242; 99 S Ct 2264; 60 L Ed 2d 846 (1979), “ ‘The very essence of civil liberty,’ wrote Mr. Chief Justice Marshall in Marbury v Madison, 5 US [1 Cranch] 137, 163; 2 L Ed 60 (1803), ‘certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection.’ ”

 Section 8 of the charter declares that the city “may” enforce the declaration of rights, not that it “must” enforce those rights. If the city opts not to enforce the declaration of rights, as it may so choose to do under § 8, the individual Detroiter would have a right with no remedy.