*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

FOOD VALUE PHARMACY CORPORATION,
doing business as CARE PHARMACY, and
CHANDRESH AMIN, R.PH.,

        Plaintiffs-Appellants,

UNPUBLISHED
March 17, 2022

v

DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

        Defendant-Appellee.

No. 354020
Saginaw Circuit Court
LC No. 19-039180-AA

Before: CAVANAGH, P.J., and MARKEY and SERVITTO, JJ.

PER CURIAM.

Plaintiffs, Food Value Pharmacy Corporation, doing business as Care Pharmacy, and Chandresh Amin, R.Ph., the owner of the pharmacy,[1] appeal by leave granted[2] a circuit court order upholding a decision by the Department of Health and Human Services (DHHS) to require repayment by the pharmacy of $164,663.13 in Medicaid overpayments. We affirm.

## I. BASIC FACTS

This case involves a fiscal audit of Care by DHHS's Office of Inspector General (OIG). The audit, encompassing transactions from January 2010 to August 2016, resulted in a finding by DHHS that Care owed $164,663.13 for Medicaid fee-for-service overpayments. The audit method DHHS employed is referred to as an invoice\inventory-reconciliation audit (IR audit). It involves comparing wholesale quantities of drugs ordered to amounts billed; if fewer drugs were ordered than were billed, the apparent excess in Medicaid billing (determined by way of an apportionment

---

[1] For ease of reference, and to match the terminology used by the parties in their briefs, we will simply use the term "Care" when referring to plaintiffs.

[2] See *Food Value Pharmacy Corp v Dep't of Health & Human Servs*, unpublished order of the Court of Appeals, entered December 18, 2020 (Docket No. 354020).

method described *infra*) is to be recovered by DHHS. Care contested the amount alleged to be owed, but after an evidentiary hearing, an administrative law judge (ALJ) upheld the assessment in a proposal for decision (PFD), and the director of DHHS adopted the PFD without elaboration. The circuit court upheld DHHS's decision in a lengthy and detailed opinion, rejecting Care's argument that the Trading Partner Agreement (TPA) into which it had entered with DHHS mandated that DHHS use random-sampling audits (RS audits) as opposed to IR audits. The circuit court also rejected Care's argument that DHHS, in conducting the IR audit, improperly looked at billing information pertaining to cash transactions and payments from private insurers.

## II. STANDARDS OF REVIEW

The issues on appeal involve contractual and statutory interpretation. In general, this Court reviews de novo, as matters of law, issues of contractual and statutory construction. *Elba Twp v Gratiot Co Drain Comm'r*, 493 Mich 265, 278; 831 NW2d 204 (2013); *Sands Appliance Servs, Inc v Wilson*, 463 Mich 231, 238; 615 NW2d 241 (2000).

"A final agency decision is subject to court review but it must generally be upheld if it is not contrary to law, is not arbitrary, capricious, or a clear abuse of discretion, and is supported by competent, material and substantial evidence on the whole record." *Vanzandt v State Employees Retirement Sys*, 266 Mich App 579, 583; 701 NW2d 214 (2005). "Substantial evidence is that which a reasonable mind would accept as adequate to support a decision, being more than a mere scintilla, but less than a preponderance of the evidence." *Id*. at 584 (quotation marks and citation omitted). "If there is sufficient evidence, the circuit court may not substitute its judgment for that of the agency, even if the court might have reached a different result." *Id*.

"This Court reviews a lower court's review of an administrative decision to determine whether the lower court applied correct legal principles and whether it misapprehended or misapplied the substantial evidence test to the agency's factual findings, which is essentially a clearly erroneous standard of review." *Id*. at 585. "A finding is clearly erroneous where, after reviewing the record, this Court is left with the definite and firm conviction that a mistake has been made." *Id*. "Thus, the circuit court's decision will only be overturned if this Court is left with a definite and firm conviction that a mistake was made." *Id*.

## III. ANALYSIS

As an initial matter, we note that this Court has recently upheld, in general terms, the use of IR audits by DHHS. In *Dearborn Hts Pharmacy v Dep't of Health & Human Servs*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354008); slip op at 2-3, the petitioner argued that DHHS did not have the authority to conduct IR audits pertaining to the period before the implementation of subsection 19.2 of the Pharmacy chapter of the Medicaid Provider Manual (MPM). Subsection 19.2 states:

> In addition to all other documentation required under state law, federal law, and MDHHS policy, pharmacy providers must maintain invoices, manufacturer and/or wholesaler sales records, distributor delivery records to the provider, inventory transfer records, provider payment records, and all other records necessary to support the size and quantity of the goods paid for by Medicaid during the audit/review period. Failure to do so will result in the recoupment of pharmacy

funds related to unsupported Medicaid claims. In the event inventory for any such product cannot be substantiated through reliable documentation for the beginning of the audit/review period, MDHHS may assume that the beginning and ending inventory quantities are the same for that product. For the purposes of this policy, the "audit/review period" shall be a period defined by MDHHS. [Medicaid Provider Manual, Pharmacy, Subsection 19.2.]

This Court in *Dearborn Hts Pharmacy* set forth the following background information:

On June 1, 2015, DHHS issued a "bulletin" informing Medicaid pharmacies of efforts to clarify the documentation requirements for pharmacy providers. Specifically, the bulletin notified the pharmacies they must maintain particular documents "to support the size and quantity of the goods paid for by Medicaid." The bulletin stated the effective date was July 1, 2015—and, it was later incorporated into the Pharmacy chapter of the Michigan Medicaid Provider Manual ("MPM") at Subsection 19.2, Invoice and Inventory Records. [*Dearborn Hts Pharmacy*, ___ Mich App at ___; slip op at 1-2.]

The Court then stated, "Though petitioner disputes the applicability of Subsection 19.2 of the MPM to the [IR] audit at issue, there are a number of authorities that predate and authorize the conduct of this audit." *Id*. at ___; slip op at 3. The Court set forth a substantial number of laws referring to DHHS's investigative powers and to recordkeeping obligations of Medicaid providers and indicated that these laws allowed for an IR audit to be conducted. *Id*. at ___; slip op at 3-7. The Court said that "DHHS-OIG clearly has long had broad authority to investigate possible fraud by the unambiguous terms of these provisions. Thus, the trial court failed to consider the plain language of other authority granting DHHS the authority to conduct investigations by focusing its conclusion of the effective date of Subsection 19.2." *Id*. at ___; slip op at 8. The Court stated, "[W]e reverse the holding of the trial court finding that OIG's authority to conduct inventory reconciliation audits is derived from and limited to Subsection 19.2." *Id*. at ___; slip op at 8.

*Dearborn Hts Pharmacy* makes clear that DHHS has the authority, in general, to conduct IR audits. The primary and specific argument being made by Care in the present case, however, is that DHHS was limited to using RS audits because of the mention of RS audits in ¶ 13 of the TPA, which states:

I agree to comply with all policies and procedures of the Medical Assistance Program when billing for services rendered. I also agree that disputed claims, including overpayments, may be adjudicated in administrative proceedings convened under [the Michigan Social Welfare Act], as amended, or in a court of competent jurisdiction. I further agree to reimburse the Medical Assistance Program for all overpayments, and *I acknowledge that the Medicaid Audit System, which uses random sampling, is a reliable and acceptable method for determining such overpayments.* [Emphasis added.]

The argument Care makes is clearly untenable. Care itself argues that the TPA is a contract, and contracts are to be interpreted according to their plain and ordinary meaning. See *Klein v HP*

*Pelzer Auto Sys, Inc*, 306 Mich App 67, 75; 854 NW2d 521 (2014). Paragraph 13 indicates that an RS audit is *a* reliable and acceptable method for determining overpayments, but it does not indicate that such an audit is the *only* reliable and acceptable method. As aptly noted by the ALJ:

> The agreement however does not contain an exhaustive list of every conceivable type of audit and to interpret the language as requested by Petitioner . . . would prohibit the Department from conducting any straightforward audit that uses even simple math.

The TPA refers to one acceptable type of audit but does not provide an exhaustive list of acceptable audits. Care's argument that the doctrine of *expressio unius est exclusio alterius*—"the expression of one thing suggests the exclusion of all others"—should be applied is not persuasive. See *Pittsfield Charter Twp v Washtenaw Co*, 468 Mich 702, 712; 664 NW2d 193 (2003) (citation omitted). In *Luttrell v Dep't of Corrections*, 421 Mich 93, 107; 365 NW2d 74 (1984), the Court stated:

> [L]ike all other such rules, [the doctrine] is a tool to ascertain . . . intent . . . . It does not automatically lead to results. As we have seen, reference to the legislative history, the rule of legislative acquiescence and the rule of avoiding absurdity and unreasonableness leads to exactly the opposite result from that which the offenders' rule would. Furthermore, there is nothing upon consideration of the plain language of the statute that would apparently point in the offenders' direction. As a consequence, while we recognize the offenders' standard rule of interpretation, we do not find it persuasive in the circumstances of this case.

The doctrine is similarly not persuasive in the present case. In fact, as stated in *Barnhart v Peabody Coal Co*, 537 US 149, 168; 123 S Ct 748; 154 L Ed 2d 653 (2003), "The canon [of *expressio unius est exclusio alterius*] depends on identifying *a series of two or more terms or things* that should be understood to go hand in hand, which [is] abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded." (Emphasis added; quotation marks and citations omitted.) The mention of *one* type of audit in the TPA does not lead to an inference that all others should be excluded.

Care appears to be arguing, at points, that DHHS should have conducted an RS audit and looked only to so-called "signature logs." The portion of the MPM specifically applicable to pharmacies states, in part:

> Pharmacy providers must document receipt or delivery of new or refilled medications to the intended Medicaid beneficiary. This documentation serves as verification of the beneficiary receiving the prescription billed. The absence of the appropriate verification indicates the beneficiary did not receive the prescription, and funds will be recouped from the pharmacy. Documentation described below must be retained for review by MDHHS or the MDHHS agent for seven years and is subject to audit. Any method of reproducing past signatures is not acceptable. [Medicaid Provider Manual, Pharmacy, Subsection 5.1.]

It continues:

Pharmacy providers must maintain a log containing the following information:

- Beneficiary's name;

- The signature of the beneficiary or that of his representative; and

- The date of receipt of the prescription.

The log must effectively differentiate between prescriptions received by a beneficiary for which counseling was accepted and provided, and those for which counseling was offered and was declined. [Medicaid Provider Manual, Pharmacy, Subsection 5.1.A.]

It seems that signature logs could indeed be one potential manner in which to audit Medicaid billings, because billings could be compared against signature logs, which serve, according to the manual, as "verification of the beneficiary receiving the prescription billed." But, as noted, DHHS undertook an IR audit in this case and was authorized to do so. Such an audit properly involves inventory and billings.[3] Contrary to Care's argument on appeal, DHHS did not use "voodoo" to arrive at the repayment figure.

Care is insistent that because it ordered a sufficient quantity of drugs to provide for all of its Medicaid fee-for-service billings, it cannot be ordered to provide any overpayment monies. But the salient fact is that the quantity of drugs ordered was not sufficient to provide for the *total* billings (including billings related to cash and private insurance), and DHHS, therefore, calculated that a certain portion of the discrepancy was attributable to Medicaid billings. DHHS's auditing witness elaborated on how this attributable portion was reached:

So the percentage of Medicaid column represents the overall percentage that can be attributed to fee-for-service Medicaid. So in the case of Abilify 10 milligram tablet again, if you look, 4,340 tablets were dispensed under Medicaid fee for service for the time period in question. The dispensing report shows 6,888 tablets total were dispensed for the time period in question to all payers including cash which results in . . . 63.01 percent which can be attributed to fee-for-service Medicaid.

---

[3] The circuit court explained one reason why signature logs would not necessarily reveal improper billings:

[T]he Department, in its review of fraud and waste, is tasked with evaluating the quantity of drugs dispensed to Medicaid beneficiaries in context with their acquisition, thus ensuring that each pharmacy has properly obtained the dispensed drugs in sufficient quantities via legitimate purchase/exchange/transfer mechanisms (e.g., rather than dispensing drugs that were free samples or obtained through the black market).

This "63.01" factor was then applied to the "missing" inventory to arrive at a quantity for reimbursement, with the quantity multiplied by average Medicaid pricing for the drug in question.

Obviously, then, as part of the IR audit, DHHS looked, in part, to billings related to cash and billings related to private insurers. Care contends that DHHS had no authority to look at these types of billings. It cites MCL 333.26368(III)(A)(5) and (6) in support of its argument. These provisions state:

> A. The Office of Health Services Inspector General shall conduct and supervise activities to prevent, detect, and investigate fraud, waste, and abuse in Health Services Programs. Specifically, the Office shall do all of the following:
>
> * * *
>
> 5. Require and compel the production of such books, papers, records, and documents as the Health Services Inspector General deems to be relevant or material to an investigation, examination, or review undertaken by the Office.
>
> 6. Examine and copy or remove documents or records of any kind related to Health Services Programs or necessary for the Office to perform its duties and responsibilities that are prepared, maintained, or held by, or available to, any state agency or local unit of government entity or contractor to a state agency or local unit of government. Any such documents or records shall be afforded confidentiality protections as provided under state and federal law. The removal of records shall be limited to those circumstances in which a copy is insufficient for an appropriate legal or investigative purpose. [MCL 333.26368(III).]

MCL 333.26368(III)(A)(5) indicates that the OIG can require the production of records it deems material to an investigation, and the total billings *were*, as noted, material to the IR audit. The circuit court aptly explained:

> Although Appellants contend that the Department is not allowed to consider any evidence relating to Care's sales to persons other than Medicaid beneficiaries, the MGM [sic] and governing law do not support this contention. Appellants rely on MCL 333.26368(III)(A)(3) and (6). MCL 333.26368(III)(A)(3) requires the OIG to "[a]ctively seek out fraudulent billing practices through the use of existing database resources managed by the Department of Community Health and available from federal sources." MCL 333.26368(III)(A)(6) provides that the OIG may obtain certain documents or records of state agencies, local units of government, or contractors thereof. However, neither provision constrains the OIG to rely *exclusively* on its own data or the data of state agencies. Moreover, MCL 333.26368(III)(A)(4) gives the OIG broad subpoena powers to obtain testimony "the Health Services Inspector General deems relevant or material to an investigation, examination, or review undertaken by the Office." Similarly, MCL 333.26368(III)(A)(5) empowers the OIG to "[r]equire and compel the production of such books, papers, records, and documents as the Health Services Inspector General deems to be relevant or material to an investigation, examination, or review undertaken by the Office."

* * *

> . . . Appellants are correct in that the data indicates that Care purchased more than enough drugs through properly documented purchases to fill all its Medicaid beneficiary prescriptions during the audit period. . . . *However, there is no data in the record to establish that the drugs used to fill the Medicaid beneficiary prescriptions were obtained through those properly invoiced/documented purchases. In contrast, the data provided by Care suggests [sic] that its documented drug purchases comprise only a fraction of the total drugs dispensed. . . .*
>
> Care therefore failed to supply records necessary to show that the drugs it dispensed to its Medicaid beneficiary customers were covered by documented purchasers or transfers. If Care only sold to Medicaid beneficiaries, its invoices, showing a purchase amount greater than those paid by Medicaid, would provide straightforward evidence of enough purchases to support the quantities dispensed. Alternatively, if Care used a tracking methodology that could tie a subset of its invoiced purchases to the Medicaid claims it paid, such documentation could support the quantity dispensed. [Second emphasis added.]

The trial court's reasoning was sound. As stated in *Prechel v Dep't of Social Servs*, 186 Mich App 547, 548-549; 465 NW2d 337 (1990), the provider (here, Care) has the burden of proving inaccurate calculations, and Care did not meet this burden or establish that DHHS violated any laws.

> Care also makes an unclear argument about document-retention requirements. It states:
>
> > Pharmacy Rules at that time only required five year retention. Obviously no one wants to retain records longer than they need to because of the expense, etc. And if the OIG is permitted to access cash and private insurance records and they are only maintained for five years, by going back seven years the records would be inaccurate.

Care does not explain to what "Pharmacy Rules" it is referring and does not explain to what period "at that time" refers. "It is not sufficient for a party simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (quotation marks and citation omitted). In addition, Care does not assert that the billing records relied upon by DHHS were inaccurate on the basis of Care's having discarded records in accordance with some unspecified five-year documentation-retention requirement.

-7-

Under all the circumstances, Care has not established that the circuit court's upholding of the agency's decision should be reversed.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Jane E. Markey
/s/ Deborah A. Servitto